UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X   Docket No. 08-CV-1634
VADIM M. SEALY,

                         Plaintiff,

          -against-                            **COMPLAINT AND JURY
DEMAND**

THE HERTZ CORPORATION,

                         Defendant.
------------------------------------------------------------------------X

       Plaintiff, by his attorneys, Gabor & Gabor, as and for his Complaint and Jury Demand,

respectfully alleges as follows:

### PARTIES

       1.      At all times relevant hereto, plaintiff, Vadim Sealy, was and is a resident and

domiciliary of the State of New York, County of Kings with his principal residence located at 38

Garfield Place, Brooklyn, New York 11215.

       2.      At all times relevant hereto, defendant, The Hertz Corporation (hereinafter

referred to as "Hertz"), is a corporation with its corporate offices located at 225 Brae Boulevard,

Park Ridge, New Jersey 07656.

       3.      At all times relevant hereto, the plaintiff worked out of the defendant's offices

located at 310 East 48th Street,  New York, New York 10017.

### VENUE AND JURISDICTION

       4.      This is a civil rights action brought by the plaintiff in order to redress multiple

deprivations by the defendant of plaintiff's rights secured by the Constitution of the State of New

York, as well as pursuant to 42 U.S.C. 2000e et seq., otherwise known as Title VII of the Civil

Rights Act of 1964, 42 U.S.C. §1981, the New York State Executive Law Section 290 et. seq.,

the New York City Administrative Code Section 8-107 et seq., and all applicable rules and

regulations.

5.      Jurisdiction is conferred on the Court by 28 U.S.C. 1331 and 28 U.S.C. 1343(a)

and under the doctrine of supplemental and pendent jurisdiction.   Venue in the Southern District

of New York is appropriate pursuant to 28 U.S.C. 1391 inasmuch as acts and transactions

constituting violations of the above Acts have occurred in this District.

6.      The plaintiff filed a complaint with the Equal Employment Opportunity

Commission on June 29, 2007.

7.      The plaintiff received a Right to Sue letter dated December 29, 2007.

8.      This action has been commenced within ninety (90) days of receipt of the Right to

Sue.

9.      A copy of this federal court complaint has been served upon The New York City

Commission on Human Rights and upon Corporation Counsel.

## NATURE OF THE ACTION

10.      This is an action brought for monetary damages for pain, suffering, humiliation,

lost wages and other compensation.   This is also an action brought for declaratory, injunctive,

equitable and affirmative relief.   Exemplary damages, counsel fees and the costs and expenses to

redress the injuries caused by the acts of the defendant are also sought.

## BACKGROUND AND FACTS

11.      The plaintiff is a Black male born on June 13, 1967, and therefore is currently

forty (40) years of age.

      12.     The plaintiff was hired by Hertz on June 4, 1994.

      13.     Throughout his career with the defendant, the plaintiff worked at several locations for Hertz.

      14.     The plaintiff was hired as an Assistant Station Manager.  As such, his responsibilities included managing a rental facility for one hundred sixty (160) regular clients and supervising a staff of four (4) employees.

      15.     At all relevant times, the plaintiff performed his job in an exemplary manner.

      16.     The plaintiff's last title with Hertz was that of Branch Manager.

      17.     On or about August 15, 1996, the plaintiff attended a meeting with Christopher Duvally, Area Manager, and Andrew Perry, Branch Manager, to discuss the plaintiff's role working under Mr. Duvally.  Mr. Duvally was promoted to the position of Area Manager on or about August 12, 1996.

      18.     Mr. Duvally is White.

      19.     On or about August 23, 1996, the plaintiff was informed that his driving privileges were being suspended indefinitely because Mr. Duvally said that the plaintiff's driving record showed a recent red light conviction.  The plaintiff explained to Mr. Duvally that he was involved in a funeral procession, but Mr. Duvally suspended the plaintiff's privileges anyway.  It was clear that Mr. Duvally seized the opportunity to punish the plaintiff without affording the plaintiff any opportunity to explain himself as was provided for in the defendant's policies and procedures.

      20.     The plaintiff returned to his office and worked the remainder of the day.  When he

closed the location at 2:00 a.m., the plaintiff was forced to walk to the train station in the pouring rain in order to get home. Had the plaintiff's privileges not been suspended, he would have been able to drive home that evening.

21.    On or about August 28, 1996, the plaintiff met with Carl Chernoff, Senior Vice President of Labor Relations, and explained the circumstances leading up to the suspension of his driving privileges. At the conclusion of the meeting, Mr. Chernoff reinstated the plaintiff's driving privileges effective August 29, 1996, and Mr. Chernoff thanked the plaintiff for the positive relationship that he has maintained with the defendant since he was hired.

22.    Throughout the plaintiff's career with the defendant, he received numerous letters and recognitions from both managers and high profile customers.

23.    In early 1998, the plaintiff received a positive performance review. In it, the plaintiff's performance is commended and no concerns were raised about the quality of his performance.

24.    Shortly thereafter, the plaintiff received a memorandum from Mr. Duvally which was post dated to just prior to the issuance of the plaintiff's performance review. The memorandum outlined concerns that Mr. Duvally had about the plaintiff's performance as well as threatened his termination.

25.    After receiving the memorandum from Mr. Duvally, the plaintiff sent a letter to Mr. Chernoff expressing his concerns that Mr. Duvally was treating him in a manner that was unlike and inferior to the manner in which his colleagues were being treated. In that letter, dated February 2, 1998, the plaintiff specifically stated that he felt that his position with the defendant was in jeopardy as a result of the manner in which he was regarded by Mr. Duvally.

4

26.    On or about August 6, 2002, the plaintiff fell at work and sprained his ankle. As a result, the plaintiff had to leave work early and be taken to the hospital. The following day, he received a telephone call at home from Angelo Leon, Personnel Manager, who admonished the plaintiff for not properly filling out an Injury Report form. Mr. Leon told him several times during that conversation that "Hertz owes you nothing."

27.    Upon the plaintiff's return to work, he saw that a memorandum dated August 12, 2002 was distributed to all of the Manhattan locations stating that the plaintiff had suffered the first "OSHA - RECORDABLE" accident in ten (10) months. The plaintiff requested that the memorandum be posted without his name included in the text of the memorandum. The plaintiff never received confirmation that the memorandum was removed from the bulletin boards of the other stations.

28.    On or about March 14, 2002, the plaintiff learned that one of his subordinates had been given his access code to the manager's office. This is a breach of security and company policy. Accordingly, the plaintiff was forced to have the code changed by security so that only the authorized employees would have access to the office.

29.    On or about May 1, 2003, the plaintiff requested a day off approximately one month in advance. A junior manager had also requested that day off. The plaintiff was told by Maria Alvarez, CM, that the junior manager and the plaintiff should "flip a coin" to determine who would be given the day off. Colleagues' requests for time off were always granted based upon seniority. The plaintiff was not given that same courtesy. The plaintiff wrote a letter to Mr. Duvally about the response that he was given by Ms. Alvarez. Mr. Duvally contacted the plaintiff and stated he was concerned about the letter complaining about Ms. Alvarez. The

plaintiff has no knowledge that any course of action was taken.

30.     On or about August 14, 2003, during the black out that plagued the North East region of the United States, the plaintiff went to work and opened the location so that customers would be able to get the cars that they had reserved.  Despite the lack of electricity and telephone service, the plaintiff was able to service twenty-eight (28) customers through the use of his personal cell phone to verify rates with the central reservation desk.  The plaintiff and one Foreman were the only office employees to open the location that day.  When he contacted Mr. Duvally and Paul Siracusa, New York City Regional Manager, the plaintiff was ridiculed.  The plaintiff was told that reservations were not being made. This did not make any sense because customers were making reservations.  On September 11, 2003, the plaintiff was commended for his efforts to continue with business as usual during the blackout.

31.     During a training conference in Nashville, Tennessee which took place on or about November 3-5, 2003, Albert Maxey, a manager from North Carolina, and the plaintiff both addressed the fact that there were no Black Executives employed by the defendant.  An Executive Manager, Paul Sheldon, assured them that their concerns would be brought to the attention of Joe Kidd, Regional Vice President.  They never received any further feedback regarding their concerns, except for the fact that shortly after the plaintiff returned from Nashville, Tennessee he was transferred to a different office in Manhattan.  Transfers to this particular office are widely viewed as demotions by other employees.

32.     Several White employees were promoted to the level of Foreman, while the Black employees were bypassed.  The plaintiff had to make several requests to Mr. Siracusa to get a worthy Black employee promoted to Foreman.

33.     In June 2004, Mr. Siracusa set the Branch Manager's schedule in such a manner that would require the plaintiff to work six days straight.  This was the third time that he had done this.  No other Branch Manager was required to work six days straight.  The plaintiff was clearly being singled out due to his race and in retaliation for his complaints of disparate treatment.

34.     On or about June 3, 2005, when the plaintiff arrived to work, he noticed that his computer had been tampered with.  Certain applications had been deleted from his computer and his icons had been deleted.

35.     On or about August 1, 2005, the plaintiff received a copy of his "Management Appraisal Objectives."  The plaintiff was rated as having average performance.  The review was performed by Mr. Siracusa.  However, White employees who were less productive than the plaintiff were issued above average performance reviews.

36.     On or about August 19, 2005, Mr. Siracusa issued an e-mail highlighting the plaintiff's issuance of certificates to customers.  There were White employees with worse ratios than the plaintiff, however they were not mentioned in the e-mail.  The e-mail was designed to embarrass the plaintiff in front of his White colleagues.

37.     In or about October 2005, the plaintiff forwarded appraisals for two (2) of his subordinates to Mr. Siracusa.  Mr. Siracusa questioned why the employees were rated above average and continually rejected the appraisals until the plaintiff lowered the rating to average.  The employees that the plaintiff had reviewed are Black.

38.     Mr. Siracusa routinely rated Black employees "Average" and rated White employees "Above Average".  As a result, the Black employees would not get promoted while

the White employees were always advanced.

39.    On or about December 18, 2005, the plaintiff once again notified Angelo Leon, Personnel Manager, and David Chang, City Operations Manager, that his location was understaffed. The plaintiff's complaint was never addressed.

40.    In January 2006, during the heaviest snow fall of the season, the plaintiff's hometown was declared an emergency area and the residents were not allowed to leave their homes. As a result, he was unable to get to work that day. When the plaintiff called in to work to notify them of the situation, Angelo Leon deducted two (2) personal days from the plaintiff's leave bank. He told the plaintiff that if he disputed it that he would have to bring it up with Siracusa.

41.    One of the benefits of working as a Branch Manager is the use of a company car. When a manager is disciplined, the type of car that they are allowed to drive may be lowered or the privilege may be suspended altogether. On March 9, 2006, as the result of an inadvertent violation of the "no-rev" policy, the plaintiff's driving privileges were reduced to a mid-size car. The plaintiff's picture was taken and sent (by Paul Siracusa) to all area managers to be used as an example. This was never done to any of the White managers.

42.    Many of the subordinate managers who were hired did not receive company training prior to their interaction with customers. The plaintiff sought to have his employees receive the proper training. The plaintiff invested his own time in training one of his subordinate managers as Management ignored his requests.

43.    On March 28, 2006, the plaintiff was advised that he would now be required to attend court appearances for fire suppression violations. This was clearly Mr. Chang's job

responsibility, but the plaintiff was forced to make the appearances.  Prior to his promotion to

City Operations Manager, Mr. Chang was the Purchasing Manager and was responsible for going

to the courts and ordering all supplies.  The duties of Mr. Chang's successor, Wing Lee, were

then delegated by Mr. Siracusa to Branch Managers, as Mr. Lee's performance was viewed as

inefficient under Mr. Siracusa's management.  This made it extremely difficult for the plaintiff to

properly perform his job responsibilities.

44.    On or about April 19, 2006, Mr. Siracusa came to the plaintiff's location to

perform an inspection of outdated materials.  Amongst some old magazines, Mr. Siracusa

claimed to have found a Personal Identification Disclosure (hereinafter referred to as "PID")

item.  Mr. Siracusa immediately chastised the plaintiff and said that the plaintiff's employment

could be terminated for exposure of a PID item.  The plaintiff advised Mr. Siracusa that he was

not aware of the existence of the item, and Mr. Siracusa said that the plaintiff was responsible

nonetheless.  Immediately following Mr. Siracusa's departure from the location, the plaintiff

contacted Mr. Duvally and voiced his concern regarding Mr. Siracusa's continued harassment.

Two (2) days later, the maintenance clerk brought in the PID receptor.  Therefore, the proper

equipment was not in place during the inspection where the plaintiff was accused of having been

negligent in his duties.  The plaintiff was clearly set up for failure.

45.    On or about May 3, 2006, during a Branch Manager's meeting held by Kenneth

Seavey, Mr. Duvally's boss, Mr. Seavey applauded the plaintiff's ability to place seven times in

fifteen separate categories in the top three position.  Mr. Seavey also stated that the plaintiff was

becoming his favorite Branch Manager in Manhattan.  However, when Mr. Seavey left the room,

Mr. Duvally highlighted on the microfilm one of the areas that the plaintiff had not excelled at.

Once again, Mr. Duvally sought to humiliate the plaintiff in front of his peers.

46.    On May 4, 2006, just one (1) day after the plaintiff's work performance was praised by senior management, his driving privileges were once again reduced. This time the plaintiff was advised that he was not authorized to drive anything other than a compact car. This decision was made just as the plaintiff was scheduled to begin vacation.

47.    On May 7, 2006, the plaintiff forwarded an e-mail to Mr. Seavey outlining his accomplishments while working for the defendant. In the e-mail, the plaintiff addressed the manner in which he was being treated by his direct managers. The plaintiff said that "[q]uarterly numbers, to me, depicts story based on real performances without unscrupulous rhetoric that is often based on personal, and subjective biases."

48.    When the plaintiff returned from vacation, Nick Walters, a Vehicle Service Attendant (hereinafter referred to as VSA), advised him that senior management had been going through the plaintiff's desk while he was away. Joe McGewan also warned the plaintiff to exercise care when dealing with management due to their actions.

49.    On or about May 18, 2006, the plaintiff was called into a meeting with Mr. Duvally wherein he was informed that Mr. Seavey had received the plaintiff's e-mail and that Mr. Duvally wanted further details regarding the "unscrupulous rhetoric" that the plaintiff had referred to. The plaintiff explained to Mr. Duvally that his concerns included his authority being undermined with his staff, improper staffing at his location, amongst others. Mr. Duvally then bombarded the plaintiff with bills that he claimed were never paid for by the location. The plaintiff explained that he had never even seen the bills before and that he felt that his staff was intercepting the mail on behalf of Mr. Leon in an effort to set the plaintiff up for failure. An

investigation was never conducted into whether or not the plaintiff's mail was being intercepted prior to his viewing it.

50.     On or about June 19, 2006, the plaintiff advised the maintenance division that the security monitors were malfunctioning and needed to be replaced immediately.

51.     On or about June 21, 2006, the plaintiff advised tech support that there was a computer malfunction which was rendering entries on his computer in another location and vice versa.  This was only happening between these two particular locations.  No other area was affected by this malfunction.

52.     On or about June 29, 2006, the plaintiff once again complained that his location was understaffed.  The plaintiff requested that a VSA Foreman be assigned to the location.

53.     On or about June 28, 2006, the plaintiff was transferred to another location.  The reason given was that he had substandard performance.  Mr. Duvally stated that the plaintiff was transferred because of past complaints that were allegedly made to the Labor Relations Director. However, Mr. Siracusa issued a memorandum stating that the reason for the plaintiff's transfer was due to the concerns raised during the meetings held on April 19, 2006 and May 18, 2006.

54.     During that meeting, the plaintiff was told by Mr. Duvally that it was up to the plaintiff to prove himself again.  Once again it was made clear that Mr. Duvally was not impartial and that he was clearly targeting the plaintiff because of his race.

55.     It was rumored that Mr. Duvally and Mr. Siracusa expected the plaintiff to quit when he was told that he was being transferred to another location.

56.     A VSA Foreman was assigned to the plaintiff's original location only after the plaintiff's transfer was effectuated.

11

57.    On or about July 3, 2006, after the plaintiff was transferred, he learned that his two managers from his original location quit.  Upon information and belief, the plaintiff was replaced by a White manager from out of town who had no prior knowledge of managing a Manhattan location.

58.    On numerous occasions, Black employees were treated in a disparate manner with respect to issues such as wages and bonuses.

59.    On or about August 30, 2006, a memo was written by Jose Perez, Branch Manager, falsely accusing the plaintiff of failing to update brochures.  The plaintiff sent a letter to Mr. Perez in which he placed Mr. Perez on notice that he was still understaffed.  The plaintiff illustrated examples where he had to cover due to lack of adequate staffing. Upon information and belief, if the plaintiff were not Black there would have been adequate staffing.

60.    In early September 2006, Hertz had a "Shape Period."  The plaintiff was understaffed during that period.  He had no coverage on September 5, 2006 and inadequate coverage on September 6 and September 7, 2006.  This was planned so that the plaintiff would have to multi-task without the proper staffing.

61.    Throughout the month of September 2006, the plaintiff had inadequate staffing. He repeatedly requested that the staffing issues be resolved.

62.    On or about December 4, 2006, the plaintiff was invited to participate in Manny Rivera's appraisal.  However, Angelo Leon would not allow him to participate in the process. The plaintiff was aware that Mr. Rivera often slept while on the job and was the subject of multiple complaints by customers.  The plaintiff complained about this to Mr. Chang but nothing was ever done.

63.     On or about December 5, 2006, Hertz held an awards luncheon.  Although the plaintiff held the "Exceptional Service Award", which at the time was the highest award to be received by a manager in Manhattan in recent years, he was not invited to the luncheon.  The plaintiff was excluded due to his race.

64.     Louis M. Rivera, a non-Black employee, scheduled a delivery during a time of day when nobody was available to make the delivery.  The plaintiff had to leave in the middle of a "shape" to make the delivery, and was not able to return to the office until 5 p.m. even though his shift in accordance with most managers ended at 3 p.m.  This delivery was important due to the fact that it was for a "Platinum Customer."  When the plaintiff returned to the "shape," he was criticized by Mr. Chang and Mr. Perez.  This is another example of disparate treatment.

65.     At the managers' meeting on December 12, 2006, statistics that compare 2005 to 2006 were presented to the group.  The 64th Street location where the plaintiff worked was the most profitable in 2005.  In 2006, the 48th Street location was up 34% in revenue.

66.     On or about December 13, 2006, the plaintiff received a poor performance review.  The review did not fairly recognize the work that he had performed.  This review was the product of racial animus and retaliation for prior complaints of race discrimination.

67.     During the holiday season in December 2006, the plaintiff was treated in a disparate manner due to race discrimination and retaliation with respect to scheduling and staffing.

68.     During a bi-weekly meeting on January 16, 2007, the plaintiff, once again, was singled out and embarrassed in the presence of his colleagues.  This treatment was due to race discrimination and retaliation.

69.     Hertz did not and would not promote the plaintiff to a position above Branch Manager.

70.     Hertz refused to promote the plaintiff to a higher position due to his race.

71.     The plaintiff was treated in a disparate manner by Hertz due to race.

72.     Upon information and belief, the plaintiff was paid less than non-Black employees due to his race.

73.     In Manhattan, Black employees received less training than non-Black employees.

74.     On March 5, 2007, the plaintiff's employment with Hertz was terminated.

75.     The reasons given for the termination of the plaintiff's employment are not true.

76.     The real reason for the termination of the plaintiff's employment was due to race discrimination and retaliation.

77.     On several occasions, the plaintiff complained that he was being treated unfairly due to race.

78.     Upon information and belief, the plaintiff's complaints were never taken seriously.

**AS AND FOR A FIRST CAUSE OF ACTION**
**RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF CIVIL RIGHTS ACT**

79.     Plaintiff repeats, reiterates, and realleges the allegations contained in paragraphs numbered "1" through "78" with the same force and effect as if set forth more fully herein.

80.     The defendant has discriminated against the plaintiff on the basis of plaintiff's race and color.

81.     The plaintiff was subjected to a hostile work environment due to race and color.

14

82.     The plaintiff's employment was terminated due to race and color.

83.     Race was a motivating factor for the adverse employment action taken against the plaintiff.

84.     At all relevant times the plaintiff performed his duties in a satisfactory manner.

85.     The hostile work environment was unwanted and unwelcome by the plaintiff.

86.     A reasonable person would have found that the manner in which the plaintiff was treated was unreasonable.

87.     The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

88.     The defendant has discriminated against the plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964.

89.     But for the plaintiff's race, the plaintiff would not have been subjected to discrimination.

90.     As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A SECOND CAUSE OF ACTION
## RACE DISCRIMINATION IN VIOLATION OF N.Y. EXECUTIVE LAW § 296

91.     Plaintiff repeats, reiterates, and realleges the allegations contained in paragraphs "1" through "90" with the same force and effect as if set forth more fully herein.

92.     The defendant has discriminated against the plaintiff on the basis of plaintiff's race and color.

93.     The plaintiff was subjected to a hostile work environment due to race and color.

94.     The plaintiff's employment was terminated due to race and color.

95.     Race was a motivating factor for the adverse employment action taken against the plaintiff.

96.     At all relevant times the plaintiff performed his duties in a satisfactory manner.

97.     The hostile work environment was unwanted and unwelcome by the plaintiff.

98.     A reasonable person would have found that the manner in which the plaintiff was treated was unreasonable.

99.     The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

100.    The defendant has discriminated against the plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of N.Y. Executive Law § 296 et seq.

101.    But for the plaintiff's race, the plaintiff would not have been subjected to discrimination.

102.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

**AS AND FOR A THIRD CAUSE OF ACTION
RACE DISCRIMINATION IN VIOLATION OF
THE NEW YORK CITY ADMINISTRATIVE CODE § 8-107**

103.    Plaintiff repeats, reiterates, and realleges the allegations contained in paragraphs "1" through "102" with the same force and effect as if set forth more fully herein.

104.    The defendant has discriminated against the plaintiff on the basis of plaintiff's race and color.

105.    The plaintiff was subjected to a hostile work environment due to race and color.

106.    The plaintiff's employment was terminated due to race and color.

107.    Race was a motivating factor for the adverse employment action taken against the plaintiff.

108.    At all relevant times the plaintiff performed his duties in a satisfactory manner.

109.    The hostile work environment was unwanted and unwelcome by the plaintiff.

110.    A reasonable person would have found that the manner in which the plaintiff was treated was unreasonable.

111.    The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

112.    The defendant has discriminated against the plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of the New York City Administrative Code § 8-107.

113.    But for the plaintiff's race, the plaintiff would not have been subjected to a hostile work environment and wrongful termination of employment.

114.    As a result of the defendant's conduct, plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

### AS AND FOR A FOURTH CAUSE OF ACTION
### TITLE VII OF CIVIL RIGHTS ACT - RETALIATION

115.    Plaintiff repeats and reiterates and realleges the allegations contained in paragraphs numbered "1" through "114" with the same force and effect as if set forth more fully herein.

116.    The defendant has discriminated against the plaintiff on the basis of the plaintiff's

17

complaints of discrimination in the workplace due to race.

117.    The defendant was aware of the plaintiff's complaints of discrimination.

118.    The plaintiff suffered numerous acts of retaliation as enumerated above including, but not limited to, being set up to fail, being denied proper staffing for his location, the issuance of poor performance evaluations, and being denied a promotion.

119.    The decision to subject the plaintiff to adverse employment actions was motivated by his complaints of discrimination.

120.    At all relevant times the plaintiff performed his duties in a satisfactory manner.

121.    The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

122.    The defendant retaliated against the plaintiff in an effort to dissuade the plaintiff and other employees from complaining about discrimination.

123.    The defendant has discriminated against the plaintiff with respect to his employment terms, working conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964.

124.    As a result of the defendant's conduct, the plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A FIFTH CAUSE OF ACTION
### N.Y. EXECUTIVE LAW § 296- RETALIATION

125.    Plaintiff repeats and reiterates and realleges the allegations contained in paragraphs "1" through "124" with the same force and effect as if set forth more fully herein.

126.    The defendant has discriminated against the plaintiff on the basis of the plaintiff's complaints of discrimination in the workplace due to race.

127.    The defendant was aware of the plaintiff's complaints of discrimination.

128.    The plaintiff suffered numerous acts of retaliation as enumerated above including, but not limited to, being set up to fail, being denied proper staffing for his location, the issuance of poor performance evaluations, and being denied a promotion.

129.    The decision to subject the plaintiff to adverse employment actions was motivated by his complaints of discrimination.

130.    At all relevant times the plaintiff performed his duties in a satisfactory manner.

131.    The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

132.    The defendant retaliated against the plaintiff in an effort to dissuade the plaintiff and other employees from complaining about discrimination.

133.    As a result of the defendant's conduct, the plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A SIXTH CAUSE OF ACTION
## NEW YORK CITY ADMINISTRATIVE CODE - RETALIATION

134.    Plaintiff repeats and reiterates and realleges the allegations contained in paragraphs "1" through "133" with the same force and effect as if set forth more fully herein.

135.    The defendant has discriminated against the plaintiff on the basis of the plaintiff's complaints of discrimination in the workplace due to race.

136.    The defendant was aware of the plaintiff's complaints of discrimination.

137.    The plaintiff suffered numerous acts of retaliation as enumerated above including, but not limited to, being set up to fail, being denied proper staffing for his location, the issuance of poor performance evaluations, and being denied a promotion.

138.    The decision to subject the plaintiff to adverse employment actions was motivated by his complaints of discrimination.

139.    At all relevant times the plaintiff performed his duties in a satisfactory manner.

140.    The plaintiff has been caused to suffer severe economic and emotional damages as a result of this conduct.

141.    The defendant retaliated against the plaintiff in an effort to dissuade the plaintiff and other employees from complaining about discrimination.

142.    As a result of the defendants' conduct, the plaintiff has been damaged in the sum of FIVE MILLION ($5,000,000.00) DOLLARS.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## 42 USCS § 1981

143.    The plaintiff  repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 142 of the complaint with the same force and effect as if more fully set forth at length herein.

144.    The plaintiff is a Black male.

145.    As a result of the plaintiff's race, the defendant denied him promotional opportunities, denied him adequate staffing for his work location and terminated his employment.

146.    The defendant deliberately intended to discriminate against the plaintiff due to his race.

147.    The plaintiff  has suffered severe economic damages as well as emotional damages as a direct result of the defendant's conduct in the amount of FIVE MILLION ($5,000,000.00) DOLLARS.

## JURY DEMAND

148.    Plaintiff demands a jury trial of this action.

**WHEREFORE**, Plaintiff demands judgment as follows:

a)    Declaring that the actions, patterns and practices of the defendants, their agents, servants and all those acting in concert with them, constituted, and does constitute, a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq.; as amended, the Civil Rights Act of 1991 (Pub. L. 102-166), 42 U.S.C. §1981; the New York State Constitution; the New York State Executive Law Section 290 et seq.; New York City Administrative Code §8-107, and all applicable rules and regulations, and common law principals.

b)    Permanently enjoining the defendants, their agents, servants and all those acting in concert with them, from violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e et seq.; as amended, the Civil Rights Act of 1991 (Pub. L. 102-166), 42 U.S.C. §1981; the New York State Constitution; the New York State Executive Law Section 290 et seq., New York City Administrative Code §8-107, and all applicable rules and regulations, and common law principals.

c)    Awarding damages for economic and emotional injuries as well as interest, costs, disbursements, common law, statutory, compensatory, exemplary and punitive damages, pre-judgment interest, pecuniary and non-pecuniary damages and such other and further relief as to this Court deems just and proper; and

d)    Awarding counsel fees, costs and disbursements of this action.

Dated: Garden City, New York
      February 15, 2008

Yours etc.,

_____
DAVID G. GABOR (DGG 9979)
GABOR & GABOR
Attorneys for Plaintiff
400 Garden City Plaza
Suite 406
Garden City, New York 11530
(516) 248-2525